Oral argument not to exceed 15 minutes for plaintiff, 15 minutes to be shared by defendants. And Mr. Gronvato for the appellant. Good morning. I have requested four minutes for rebuttal. You may. This is a Section 1983 case arising out of the medical care, or appropriately lack of medical care, provided to Cardinal Warren during the final 15 days of his life. During that 15-day period, Mr. Warren first reported severe chest pain. He even diagnosed himself as perhaps having a heart attack. During the 15 days that followed, Mr. Warren's condition actually deteriorated somewhat. With several interactions with the prison medical staff, Mr. Warren, by the 28th of January, was reporting not just chest pain and shortness of breath, but also nausea, dizziness, tightness in the chest. At that point, is that the interview with Nurse Pope? That is correct. The 28th. That's correct. The following day, his symptoms would prove to be even more ominous. That's two days before his death, because at that point he reported not only did he have chest pain and shortness of breath when he was exerting himself or walking, as he explained previously, but this time he woke up with it. As I think everyone agrees, that is a real turning point medically, because of the unstable angina that's a part and parcel of this type of chest pain when there is no exertion and you have these deteriorating symptoms. The trial court in this case ruled that the summary disposition was appropriate on the issue of deliberate indifference. That deliberate indifference comes in two forms, as the court knows. One is objective and one is subjective. The objective component is not a part of this appeal. The serious medical need is well established and it's not being disputed. So we are down to the subjective component of the deliberate indifference standard. I wanted in my limited time here to talk about one of the themes that has been developed by this court post-Farmer, actually in Farmer, and that is the obviousness of the particular medical need. Farmer itself identified obviousness as allowing for the inference that there was in fact knowledge of a serious medical condition that required some amount of attention. The obviousness issue and the inferences that one could have reached in direct contradiction to the circuit of district court's ruling in this case comes in a variety of forms. There is actually testimony from two important witnesses with respect to the obviousness of Mr. Warren's condition. The first is plaintiff's expert, Dr. Stark. Dr. Stark testified that the particular symptoms which he displayed even as early as the 16th were in fact sufficient to require hospitalization. Dr. Stark directly refuted the suggestion that in point of fact there was something less than serious about Mr. Warren's condition precisely because he reported that when he rested his chest pain went away. Dr. Stark specifically testified that that was not insignificant, that it was not significant as a basis for denying him further medical care. The other person who testified, and very importantly on this case, is one of the defendants in the case, Mr. Kim, a nurse. Mr. Kim offered two very important pieces of evidence here. The first is he directly supported the point that the nurses within the facility do in fact have the authority to immediately order someone to obtain hospital care, emergency hospital care. So there's no question that they have the authority. But the second part of Mr. Kim's testimony, which goes to the obviousness of Mr. Warren's medical condition and the need for further medical care, was that Mr. Kim testified that any type of chest pain of this type, of severe chest pain, has to be treated with great seriousness and unless you can rule out no heart problems, no heart attack problems, it should in fact receive immediate medical care. Which leads to the third point, which goes to the obviousness issue, and that is the policies and procedures that were part of the response to the motion for summary judgment. Now those policies directly identified chest pain, and mind you, this is chest pain all by itself. It's not accompanied by even, it doesn't say shortness of breath, it doesn't say nausea, it doesn't say dizziness, it doesn't say tightness in the chest. The policies identify just chest pain as something which they classify as an emergent situation, and emergent is defined in another of the policies that we cited to as a life-threatening situation. Counsel, let me sort of cut through here, at least from my understanding. Do I take it then that, from what you've told us so far, a prisoner who has chest pain, albeit from exertion and then has not having it at the moment because he's not exerting, needs to be sent to the hospital and not doing so is deliberately indifferent, starting on the 16th or the 18th, the first time he does it? Well, it doesn't necessarily have to resort to a hospitalization. I can't suggest to you, and I would be frank in telling you, that I don't read the policies themselves as requiring hospitalization. And the policies don't, I mean, to me the policies are malpractice, they're not 1983, that when they create policies, that doesn't make them constitutional rights. We're not suggesting they are constitutional rights, but certainly the decisions of this Court have elevated policies to its significance with respect to any issue regarding deliberate indifference. I've cited a number of cases from this Court, including two or three cases, which members of this panel wrote on the subject of this. But to get back to your question, the fact is that the policies, even if they do not require instant hospitalization, and Dr. Stark would dispute that, but even if they don't, they go directly to the whole point of what I've been trying to talk about here, and that is obviousness. This is, even if it's addressed to somebody like a guard, the fact is the policy that's been prepared, promulgated by the prison authorities, says this is a very, very significant event. If you are presented with chest pain, forget about shortness of breath, forget about dizziness or nausea, if you are presented with chest pain, you must take it seriously. But in that, if all it is is taking it seriously, to me at least, it's hard to read this record and say they're not taking it seriously, that they're trying to get tests, they're trying to schedule them, they're trying to get him to take his medication. He has medication. He doesn't seem to be taking it all the time. And so you clearly have these efforts. They see him, they address him, and I'm trying to struggle with where, at what point it becomes deliberate indifference, unless you say that it is from the very beginning. That's why I tried to ask you about that, that as soon as he presents with chest pain, everything else they do has been deliberately indifferent, and I find it hard to buy that. The farmer test is whether you act or fail to act, despite knowledge of a substantial risk of serious harm. Now, using that as the test, even as of the 16th, when he reports, I think I'm having a heart attack, I have chest pain, even when he reports that on the 16th, they have, Dr. Balmer says, the one time he did examine him in this 15-day period, Dr. Balmer says the diagnosis is he has atherosclerotic heart disease. He has it. Lots of people have that and don't get sent to the hospital. Isn't that the difference between stable angina and unstable angina? That's correct. They don't get sent to the hospital. Again, Dr. Stark would disagree with you when you say that. But the fact is that what was done in response to that was, in fact, with knowledge of the serious harm that could result, they knew that he had this chest pain, and they know what chest pain can be. Even if the hospitalization is not the litmus test here, the fact is that they had to do something to rule out that this was, in fact, a heart attack. The fourth point I was going to make on this obvious issue was to bring to the court's attention a decision which you are quite familiar with, and that is the Carter case. Because the Carter case did, in fact, despite factual differences that exist in the Carter case and this one, the Carter case does stand for the proposition that where you have these classic symptoms, that's the words that were used in the Carter case, where you have these classic symptoms of a heart attack, that in the Carter case, as you well know, Judge Boggs, the resort of the actions that should have been taken in light of these classic symptoms was to take Ms. Carter to the hospital. Now, what's important, it seems to me, in terms of application to this case, is what the court in Carter identified as the classic symptom, and that is chest pain and shortness of breath. Now, in this case, we have chest pain and shortness of breath as early as the 16th. By the 28th, we have the symptoms getting much worse, by the 29th, even worse. But the point is, the obviousness of the particular danger presented to Mr. Warren was, in fact, patent as early as... One quick question on Nurse Pope. If she had a list of symptoms, just a list of symptoms Nurse Pope heard from Mr. Warren, and she is a nurse, so is it your position that her failure to send him to the hospital is deliberate indifference? And if so, how do you handle the fact that she called a doctor and a doctor told her just to give him nitroglycerin? And that's what she did. She did what she was instructed. Based on Mr. Kim's testimony and Dr. Stark's testimony, she should have sent him to the hospital. She had the authority, and she had the information in front of her. She had the serious medical need at that point. At that point in time, he should have been sent to the hospital. If she instead calls a doctor, a supervising doctor, does that satisfy her requirement to have acted, and does that kind of create an intervening cause for not going to the hospital, i.e., the other doctor? Our position, obviously, is no, it doesn't. It doesn't because when presented with these symptoms that he had, it was not a decision that rested anywhere else but with taking him at that point. He had to receive emergency medical care. Thank you, counsel. We'll have your time for rebuttal. Good morning. When an inmate has received medical care, this court applies a grossly inadequate standard for evaluating claims of deliberate indifference to serious medical needs. Is that standard, in your view, different from deliberate indifference, or is that simply a way of saying deliberate indifference? It is simply a way of saying deliberate indifference. Under the Terrence case, Just so I'm clear, which sets of defendants are you representing? I'm sorry, I represent Adam Edelman, M.D., and Jeffrey Baumer, D.O. Okay, so you basically get the doctors. Yes. To rise to the level of a constitutional violation, the medical care must be so grossly inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness. In determining that under the Farmer v. Brennan case, the question to consider is whether the appellees knew but disregarded an excessive risk to Mr. Warren's health. Thus, we must look at what did Dr. Baumer and Dr. Edelman know and what did they do with their information. Did they disregard or ignore Mr. Warren's medical condition, or did they take appropriate steps to address it? Here, both Dr. Baumer and Dr. Edelman not only took appropriate steps to address it, they did meet the standard of care. In a nutshell, the appellant argues that the facts in this case are similar to the Terrence case, but really they are not. In the Terrence case, the decedent was at risk for heat stroke, yet the defendants in that case did not take the simple steps necessary to keep him in a cool environment. That is why those defendants were not entitled to summary judgment. But here, with respect to Mr. Warren, there was no simple step that the appellees could have taken to save him from having a myocardial infarction. I'm looking at the evidence that Dr. Baumer knew, and I know you argue that he wasn't having a heart attack when he saw him, but we've got to look at all of the things that Baumer knew. Baumer saw him after he had reported chest pain, sweating, shortness of breath, and said that he had never had pain like this before. We have the records that show he's saying it's a 9 on a scale of 1 to 10. On the 27th, Baumer gets more information from Kim, and we've heard some of what Kim has had to say. We have Nurse Pope's information about waking up with pressure in the chest, weakness, dizziness, wheezing, shortness of breath, nausea, again, the pain symptoms. And in light of all this, on the 29th, Baumer knows that he now has, in addition, 105 pulse and high blood pressure, and he prescribes a dietician, medicine, and biweekly blood pressure checks. How is that not grossly inadequate? With all due respect, Your Honor, on January 27th, the conversation between Nurse Kim and Dr. Baumer was about the stress test, and it was on that date that it was brought to Dr. Baumer's attention that that test had not yet been scheduled as he had believed it was. But the difficulty that what I'm struggling with is that Baumer has already seen him. Baumer is already aware of what he's had to say about what he's experiencing. So the stress test is not some other doctor or some stress test now because of age or weight. He's already seen this gentleman. He knows he weighs 250 pounds. He knows that he has diabetes. He knows that he's not always taking his diabetes medicine. He knows that he is reporting terrible pain. He says he wants to see a doctor because he thinks he's having a heart attack. Then he finds out a week later, oh, they've never even done the stress test. And in the interim, there are, he sees Freytag, Baumer again on the 18th. Freytag and Baumer discussions on the 20th. Edelman on the 21st. This is a record replete with a man coming and requesting assistance. So I'm once again struggling with how, in light of all of this information, we have Dr. Baumer on the 29th adding high blood pressure to this list of symptoms and saying give him a dietician, medicine, and biweekly blood pressure checks. When Dr. Baumer saw Mr. Warren initially on January 18th and assessed him, he was not having chest pain at that time, and he ordered the stress test. He also ordered an EKG, which was normal. Then on the 29th, Dr. Baumer saw Mr. Warren for the second time. He only had those two contacts with him. And it's very important to note that on the 29th, the computer system was down. So Dr. Baumer had no access to the electronic medical record. He did not know of the encounters that Mr. Warren had with nurses on January 28th or January 29th. My struggle is he's already seen the man. He knows of all these comorbidities or whatever, however you want to address them. He knows that the man has told him, I've never had pain like this before. I think I'm having a heart attack. Isn't it his responsibility as a physician to say, what else has gone on since I last saw him? You have not given him the stress test. Records are down. I can't get on the computer. Tell me what's happening. Well, in the conversation that Dr. Baumer had with Mr. Warren on the 29th was that Mr. Warren told him that he was feeling fine, that he had taken some nitro, and that it had helped him. And his primary concern, his only real concern at that time, was he wanted a snack bag. He wanted an order for a snack bag relative to his diabetes. And that was what he was interested in when he was talking to Dr. Baumer. He was not having chest pain at that time. And even the next day, on January 30th, the widow of Mr. Warren testified that when she talked to him on that day, he told her he felt fine and he was doing better. This is very different from a situation like Carter, where someone was in intense medical or intense chest pain and it was not relenting and people just failed to contact my mom. He was screaming that I need help and so on. Yes. That's sort of in Carter. Yes, with Mr. Warren, he was struggling with if he's – if you have all this background information and the heart works sometimes and then doesn't work other times and you know you're trying to get a stress test because you foresee a problem and then there's all this additional information. Maybe I just need to ask you point blank. Do you have to be having a heart attack when you see this doctor in order for him to have the responsibility to get you to an emergency room? Is that your position? No, but for there to be an emergent situation, there needs to be something going on that the doctor can assess at that time as being emergent. It seems that your argument really is that if the pain or discomfort is intermittent, then it's not emergent. So you have to have continuous heart pain is what I'm hearing, or chest pain, as opposed to having had, as Judge Strantz has indicated, several days, if not a week or more, of chest pain being difficult and subsiding and rest but not being continuous. But here, as of the 29th, still there was some degree of intermittency. So is that the argument really, that it's got to be sustained, it has to be continuous as opposed to fairly regular but not constantly ongoing? The argument is really that the doctor makes his assessment at the time the patient is there based on everything that he knows at the time. So that would include if the patient is reporting at that time that, well, I'm not experiencing chest pain at this moment, the doctor has to look at the bigger picture, right? I mean, the 27th, the 28th. He didn't know about the 28th and the 29th. Because the medical records were down? That's right. Why wouldn't that be an issue of fact for the jury to decide in terms of the doctor's knowledge about this? There's no evidence to the contrary. The evidence is clear that the record was down. I'm sorry, when you say the record is clear, is there external evidence like the computer system tech or is it simply Dr. Bomer's statement? In the medical records it is documented that there's a late entry because the system was down. That's by whom? I believe one of the nurses. So she says that her information or Dr. Bomer's information, give me the exact context of what you just said. I'm not sure exactly, but I do know that it is in the medical record that the system was down on that date. On that date, a particular time of that date? I don't know, January 29th and particularly at the time. What I mean is that the relevant crucial time here at least, or one crucial time one could look at, is the time that Dr. Bomer saw him, which was what, midday on the 29th? Nurse Schilling saw him at 5.20 in the morning. He had just awakened with chest pain, right? And maybe we'll get to that in a minute. You'll have your time. I see you're getting nervous. I'm getting nervous. I'm taking notes. You didn't tell me at least how much each one of you wanted, but you'll get heard. So am I right that she saw Schilling at 5.20 in the morning, saw Bomer sometime later in the day, at which time he was mostly interested in the snack bag, but then presumably this is in the record somewhere so we could find it as to what the evidence is as to the system being down. Is that your statement? Yes. Okay. To take a different spin on Judge Cole's question, is it that if you're having chest pain with exercise and it stops with resting, that indicates stable angina? If you're having it like when you wake up in the morning, that might indicate unstable angina, which would be a much greater medical condition. Is that a fair reading of both the record and your view of it? Yes. And, you know, as far as Dr. Bomer knew on January 29th, Mr. Roden was still having stable angina. And under the policies, one would be sort of an urgent condition and the other would be an emergent condition. Yes. Anything else from this counsel? Thank you. No, it's about the nurse that I have a question. You represent the nurse. Okay. Thank you, Your Honors. Good morning. My name is Mark Donley. May it please the Court. I'm with the Michigan Attorney General's Office and I represent the nurse defendants in this case. And I didn't mean to show a lot of impatience there, but I was worried that time was running out on me. I just want to highlight, because of the shortness of time, I just want to highlight what I think that my opposing counsel's main arguments are, because I think otherwise, factually, in terms of developing the facts and the law, I think our briefs are fairly thorough. So as I see what the plaintiff is saying is that any time a prisoner has chest pain, they have to go to the hospital. And if they don't go to the hospital, that's deliberate indifference. No, I think he absolutely denied. Your opposing counsel denied that that is his position just a few minutes ago. Well, then that's good to know because I don't think that's what the brief says, because I think they've relied heavily on Dr. Stark, a board-certified cardiologist in suburban New York City, to say what type of care should be provided at a somewhat remote prison in the Upper Peninsula of Michigan. And as I understood what the plaintiff was arguing in their brief is that any time a prisoner complains of chest pain, according to Dr. Stark, they must go to the hospital. I'm glad to know that's not the case. I think in this case what we need to look at from a deliberate, and I know that the court knows this, we're here on an Eighth Amendment claim. We're here when we go back, and you're talking about cruel and unusual punishment, and I know how it's developed over the time, and it's deliberate indifference to a serious medical need. You look at what each one of these nurses knew and did on each of the instances that they had contact with Mr. Warren. And so the only nurse that saw him twice was Schilling, once on the 16th, once on the 29th. Freitag saw him on the 18th, again on the 20th, I suppose, in order to give the EKG. Pope saw Warren on the 28th. In every one of those circumstances, the nurses did what they were supposed to do. The very initial complaint didn't come where Warren showed up at the health care clinic and said, I'm having chest pain, I feel like I'm having a heart attack. It came as a kite. It came as a note sent through the prison mail system that Schilling then read in the middle of the night, and when she got it, she called him up immediately in his cell and said, What's going on? Are you having pain now? When does it happen? And at that time it seemed to be, the Warren reported, that he thought it was related to his medication that he was taking. So what did Schilling do? She said, If you have chest pain again, call back to the clinic immediately, and I'm going to set you up on the schedule to see the doctor, which she did. Bomber saw him. Let me jump, at least for me, that other judges may have different views, but let's go to the 29th and Schilling, because here he wakes up with chest pain, which, at least the question I asked your co-counsel, that that seemed to be a significant difference, at least from any of the other times. So talk about what Schilling did that morning, because he came in like ten minutes after he woke up. Is that right? That's correct. And according to the record evidence, that is a difference in his condition, that he went from stable to unstable, or at least the possibility of that. So what did Schilling do? When he came in, he was not in distress. All his vitals were in pretty good shape. The only thing that was a little bit elevated was his blood pressure, but it was 140 over 89, which is very borderline high. I know a lot of people that walk around with blood pressure a lot higher than that. So she took very extensive notes. He wasn't in any distress at the time. And she gave those notes to Dr. Bomber? Well, she left the notes for, she set him up, she physically added him to the doctor's call out for that morning and left the notes. She did not physically give the notes to Dr. Bomber because they weren't at the prison at the same time. She testified at least, if you believe the testimony, that the computer was down at the time of her encounter, and that's why she didn't enter it in the computer. Right, the computer was down. There's substantial record evidence that the computer was down. That's why she had a very long handwritten note, and she wouldn't have had a handwritten note if the computer was up. So the handwritten note would have been for the doctor? Correct. It was for the medical record. Okay, so she wrote out all of this information about waking up with severe chest pains and hand wrote it so Dr. Bomber would have it when he examined him. Well, yes. Somebody would have it. Right. I mean, to be fair, there's no evidence that she stayed. I think she got off at 6 in the morning and Bomber might have come in at 9. There's no evidence that she stayed so that she could physically hand the progress note to Dr. Bomber. But she knew that the computer was down. Correct, and that's why she wrote the note. And that's why she wrote the note, so that he would be sure to have that information when he saw him that morning. Well, I would presume so. The note was written so that it was documented what she did, what she found, what the complaints were, and why she added him to the call-out sheet. I mean, Warren was added to that morning's call-out sheet for the doctor, and the only handwritten thing on the call-out sheet, which is just a small list, and I can't remember what page number it is in the record, but it is in the record, and it has CO chest pain, complaint of chest pain. And that's why he was added to the call-out for that morning. So I guess the medical care that was provided to Cornell Warren may ultimately have failed him, and obviously that's quite unfortunate. But there's a series of factors that led to that. One of it was Mr. Warren's own noncompliance with his medication. He didn't really push going forward. There was a mix-up with the scheduling of the stress test, which was not the fault of any named defendant. And each one of the nurses, when they had contact with Mr. Warren, did the assessment and turned it over to the doctor. Are there any particular questioning or reasoning of Nurse Schilling as why she didn't send him to the hospital right then, that if you wake up with chest pain, that's unstable angina, that's emergent, that's need to go to the hospital? Right. The testimony, and with all due respect for my opposing counsel, the testimony of Mr. Kim is a little bit different than as it's been characterized. Mr. Kim... Can you answer my question about what Schilling says or did she say anything about her treatment that morning? Right. The general protocol for these nurses, as they've been instructed to do and Kim testified about, is that yes, they have the ability to send them to the hospital, but they do it if somebody is experiencing an emergent condition when they're assessing them. So like in the Carter case where that inmate or detainee... First off, you're still not answering my question, but was Schilling questioned about what she did and why that morning? She was. She gave a very lengthy deposition. The lengthy deposition was because he was not experiencing distress, all his vitals were stable with the exception of a slightly elevated blood pressure, that she thought it was sufficient to add him to the call-out to see the doctor that morning. So from her point of view, at least, it was not emergent because he was not in distress at that time, plus the other things you've stated. Correct. Is that a fair reading? That's a fair reading, Your Honor. What about Nurse Pope, who saw him on the 28th when he reported heavy pressure in his chest, weakness, dizziness, wheezing, shortness of breath, nausea, pain 9 out of 10, too severe for him to eat, and that the symptoms had been ongoing for a month? Why wouldn't that be sufficiently emergent that she should have then sent him to the emergency room? Because the evidence was that that is what he had experienced in the past. Again, when she assessed him, all of his vitals were normal, but she was concerned because of what he was reporting. So objectively, none of those things were present. Those were his subjective reports as to what he had experienced. He subjectively reports every classic symptom of a heart attack. That's not good enough. For her to immediately send him to the hospital? No, it's not good enough. She did what was appropriate. Even plaintiff's expert, Susan Rice, testified that what Nurse Pope did was absolutely correct. She called the doctor and said, this is what's going on. What do I do with him? Is that doctor a defendant? Dr. Birch? No. He's not. He's an employee of a defendant. He's an employee of the prison health services. Anything else? Okay, thank you, counsel. Thank you, Your Honor. I have your time for rebuttal now. Mr. Gonzata? A couple of points. Judge Cole, you asked a question about whether the policies make some sort of distinction between chest pain and something that becomes worse than chest pain, and I think the attorney for the doctors said that that was true. That is not what these protocols say. The protocols speak specifically only of chest pain, only of chest pain, something I obviously, Mr. Warren, reported as early as the 16th. Going to the 29th, which is the big, I think, obviously the most important date for our purposes here, the fact is, Judge Strange, as you confronted my opposing counsel on this, the fact is that Dr. Balmer, on that date, his note says, this is a man who knows that he has diagnosed potential heart disease days before. He knows that it was sufficiently serious that he scheduled this cardiolite stress test, a specialized stress test. He knows there was severe pain as many as 11 days before. He knows all these things, and he also knows that he has been put on the call list for the 29th, which means he knows he has seen somebody earlier in the day. His note on that date reflects an extraordinary lack of curiosity. He actually puts into his note that Mr. Warren came there for a snack bag. Well, Mr. Warren was not put on the call list to get a snack bag. He was put on the call list because he had been examined that morning by somebody that Dr. Balmer now says, I didn't have contact with. But he was put on that call list for a medical reason, not a snack bag reason. But that's the extent, if you read his notes for that, that's basically the extent of what he did. He's reporting that that's what he tells him. That's correct. Okay, I mean, so is it, number one, is the inference that Balmer is simply lying in the notes or that Balmer is lying about the computer being down? The inference goes two different ways. Either he is lying, and I have to say, I don't agree with Mr. Donnelly. I thought that the testimony was that there was a slight overlap in the time period. I'm sorry, overlap? There was an overlap between the time Ms. Schilling was there and when Dr. Balmer came in. That's my recollection of the testimony. It's not, I didn't cover it in my brief, but there is also I'm not lying. It seems to me that if you are the nurse who hears all these complaints and you know the computer is down, you either send that guy to the hospital or you go to the doctor and you say, here is my handwritten note. Let me make sure you have it. I'm just a little bit at a loss as to how we could have this very dangerous situation that indicates the necessity for a long handwritten note and not clarity on how that long handwritten note gets to the doctor. Obviously, that's our position here, but that's correct. Mr. Donnelly suggests she did everything. She did everything she was supposed to do. That can't be right under these circumstances, at least on the 29th. May I, Judge Boggs, just address your point? Because I said there were two different inferences to be drawn. The first is that it is not correct what he put down. The second is, if it is correct, it shows an extraordinary lack of attention. What it shows is an indifference. If this is all he talked about to a man who has, even based on his knowledge of this over the 11-day period, it shows an extraordinary indifference. That's the point of this. That's the other inference to be drawn. You say that based on his own past knowledge, where he obviously was heavily involved in trying to get these tests. That's correct. Let me finish. Plus the fact of the call-out sheet. Does the fact that you're on a call-out sheet indicate anything other than some medical condition in terms of the degree of medical condition? When you go back to his note, and you see really the lack of inquiry for a man who has been put on this call-out sheet. He's been put on it for a medical reason. That's the point of this. This is a man that he knows at the time was in serious enough condition 11 days before that he ordered a stress test, a specialized stress test, because he was worried about heart disease. Again, do you have any reason, are you disputing the notes that he was feeling great and did not have any concern regarding chest pain? Now, maybe that was bad on Mr. Warren's part, but do you doubt that that indeed was what he was confronting that morning? I would certainly have doubts, but the computer's down, and there was no way of determining the accuracy of this. There was, however. I'm referring to this is his own note and then his deposition testimony, right? Yes, that is his deposition. He also had a handwritten note that morning, which we have. Yes. Okay. I know your time has expired. Could you just take one moment to address Kathy Pope again, address Kathy Pope's role in this? Yes, Pope. Well, she evaluated Mr. Warren. She gave him nitroglycerin. She called the on-call doctor, passed along Mr. Warren's vital signs, I think, and then scheduled him to see a doctor the next day. So what is the evidence of deliberate indifference? The point with respect to Ms. Pope is, in fact, tied, obviously, to unstable angina because that's what he had at that point under the definition of the term because his symptoms were, in fact, deteriorating. But she called the doctor. I know she called the doctor. I understand. But the point is, obviously, our position is that at that point, she was somebody with the authority to send him, at that point, to send him for emergency care. When a nurse has authority to do X, but she also has a doctor available, it may have been a bad call, but how can it be deliberate indifference to call the doctor? She has knowledge of a serious medical care. That's the point of our position. She has knowledge. But she certainly did something about it. She called the doctor. The doctor gave her medical advice or direction. Yes, I understand. And I don't know whether at that point she could have said, you know, to heck with you, you're a doctor, I'm going to send him to the hospital. I don't know whether she could legally have done that. Maybe she could have. But is that deliberate indifference not to do it? We've cited the Lamarbe case and the other cases from this court, Quincy is one of them, which have said that doing something does not exonerate you from a finding of deliberate indifference. Okay. Thank you, counsel. That case will be submitted. The clerk may call the last case.